**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHAD GOETTERMAN, and ANDREW LYLES and KOHCHISE JACKSON, as Assignees of the claims of Dr. Keith Papendick, M.D.,

Plaintiffs,

v.

YITZCHOK LEFKOWITZ, DAVID GEFNER, ABRAHAM GOLDBERGER, SARA TIRSCHWELL, YERMIAH LEITNER, ZALMAN SCHAPIRO, JEFFREY SCOTT KING, PERIGROVE 1018 LLC, and JOEL LANDAU,

Defendants.

**Case No. 26-cv-09086**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, Chad Goetterman, and Andrew Lyles and Kohchise Jackson, as Assignees of the claims of Dr. Keith Papendick, M.D., by and through undersigned counsel, and for their Complaint, state as follows:

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, and under 18 U.S.C. § 1964(c), which authorizes any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962 to sue in any appropriate United States district court.

2. Venue in this district is proper per 18 U.S.C. § 1965(a), as at least Defendants Yitzchok Lefkowitz, David Gefner, and Joel Landau transact their affairs from 885 Third Avenue, 29th Floor, New York, NY.

**THE PARTIES**

3. Plaintiff Chad Goetterman is a nurse. He was formerly employed by Corizon Health, Inc. to provide medical services in the Kent County Jail. Kohchise Jackson and Andrew Lyles are the assignees of the claims previously held by Dr. Keith Papendick, M.D. against the named Defendants. Dr. Keith Papendick is a former employee of Quality Correctional Care of Michigan, P.C., a captive professional corporation that was managed and controlled by the former healthcare contractor for the Michigan Department of Corrections, Corizon Health, Inc.

4. Defendant Jeffrey Scott King was the Chief Legal Officer of Corizon Health, Inc. until May of 2022. From May of 2022 to August of 2026, he was the Chief Legal Officer of Yescare Corp.

5. Defendant Yitzchok Lefkowitz, a/k/a Yitzchak Lefkowitz, a/k/a Isaac Lefkowitz, is an individual who led a group of investors in an acquisition of the parent company of Corizon Health, Inc. in December of 2021. Between December of 2021 and the present, Mr. Lefkowitz sat on the Board of Directors of Corizon Health, Inc., controlled some of its bank accounts, and directed the activities of its outside counsel.

6. Defendant David Gefner is a long-time business associate of Defendant Yitzchok Lefkowitz and a member of the group of investors who acquired Corizon Health, Inc. in December of 2021. On information and belief, Defendant Gefner is a current or former employee of Defendant Joel Landau and/or of entities controlled by Defendant Landau.

7. Defendant Joel Landau, a/k/a Yoeli Landau, is a long-time business associate of Defendants Lefkowitz and Gefner. On information and belief, Defendant Landau is a member of the group of investors who acquired Corizon Health, Inc. in December of 2021.

8. On information and belief, Defendant Yermiah "Jay" Leitner is a current or former employee of Defendant Landau. Defendant Leitner, along with Defendants Lefkowitz, Goldberger, and Gefner, installed themselves as the Board of Directors of Corizon Health, Inc. and as the Board of Directors of Corizon Health's parent company, Valitas Health Services, Inc., in late 2021.

9. Defendant Abraham Goldberger is a member of the group of investors who acquired Corizon Health, Inc. in December of 2021. Defendant Goldberger was also a Director of Corizon Health, Inc. and Corizon Health's parent company, Valitas Health Services, Inc.

10. Defendant Sara Tirschwell was the CEO of Corizon Health, Inc. in 2022 prior to the divisional merger that the company underwent in May of 2022. Following the divisional merger, Defendant Tirschwell was CEO of Yescare Corp.

11. On information and belief, Defendant Zalman Schapiro is an attorney and longtime business associate of Defendants Lefkowitz, Gefner, and Landau. Defendant Schapiro acts as in-house counsel for various entities that are beneficially owned and/or controlled by the other individual Defendants.

12. Defendant Perigrove 1018 LLC is a New York limited liability company formed by Defendant Gefner on or about December 2, 2021. On information and belief, the beneficial owners of, and investors in, Perigrove 1018 LLC include Defendants Lefkowitz, Goldberger, Landau, and Gefner.

## COUNT I: VIOLATION OF THE RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c) and (d)

13. Defendants Lefkowitz, Schapiro, Gefner, Leitner, Tirschwell, Goldberger, King, Landau, and Perigrove 1018 LLC were members of a group of individuals and corporations that

constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) (the "Enterprise"), that is a group of individuals or entities associated in fact, although not a legal entity, which engaged in, and the activities of which affected, interstate commerce. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the Enterprise.

14. The Enterprise has existed since at least 2021 and continues to exist and operate today.

15. The purposes of the Enterprise include 1) acquiring and maintaining control of companies that are insolvent, 2) removing cash and assets from those companies in contemplation of bankruptcy through a variety of schemes, including but not limited to insider transactions in which the insolvent companies purchase goods and services at inflated prices from shell companies owned by the members of the Enterprise, and 3) concealing their fraudulent transfers during the bankruptcy process and otherwise preventing creditors of the bankrupt companies from recovering the pilfered assets.

16. On information and belief, the Enterprise has looted at least three insolvent companies prior to placing them into bankruptcy since 2021: Corizon Health, Inc., LaVie Care Centers, LLC, and Genesis Healthcare, Inc.

17. The means and methods by which Lefkowitz, Gefner, and other members and associates of the Enterprise have conducted and participated in the affairs of the Enterprise include a pattern of racketeering activity, including multiple acts of wire fraud, in violation of 18 U.S.C. § 1343, and bankruptcy fraud, in violation of 18 U.S.C. § 152(7) and 18 U.S.C. § 152(8).

**PREDICATE ACTS**

18. On information and belief, in or about November of 2021, Defendants Lefkowitz, Goldberger, Landau, and Gefner pooled their resources to acquire the non-operating parent companies of Corizon Health, Inc., a correctional healthcare contractor that, at the time, was on the brink of bankruptcy.

19. Defendant Gefner participated in the Enterprise by organizing new entities, including Geneva Consulting, LLC, a Delaware LLC which he formed on or about November 16, 2021, approximately two weeks before the group acquired the Corizon family of companies, and Perigrove 1018 LLC, a New York LLC which he formed on or about December 2, 2021, one day before the acquisition. Perigrove 1018 LLC would be used as the vehicle to acquire Corizon's ultimate corporate parent, M2 HoldCo LLC. Geneva Consulting, LLC would be used to suck cash out of Corizon while Corizon was insolvent through a sham consulting agreement, and later to act as the shadow owner of Corizon's former assets through its domination and control of Yescare Corp. and CHS TX, Inc.

20. Defendant Perigrove 1018 LLC acquired the Corizon family of entities on or about December 3, 2021.

21. On or about December 3, 2021, Defendants Lefkowitz, Goldberger, Gefner, and Leitner installed themselves as the Board of Directors of Corizon Health, Inc., and as the Board of Directors of Corizon's immediate parent company, Valitas Health Services, Inc.

22. On or about December 6, 2021, Defendants Lefkowitz, Gefner, Goldberger, and Leitner caused Valitas Health Services, Inc. to enter into a "Consulting Agreement" with Geneva Consulting, LLC, under which Geneva would be paid $3 million up-front for six months of

services, followed by $500,000 per month thereafter. (Ex. 1). The services to be provided were described only as, "corporate restructuring."

23. The "Consulting Agreement" was signed by Defendant Lefkowitz on behalf of Valitas Health Services, Inc. and by Defendant Leitner on behalf of Geneva Consulting, LLC. On information and belief, the "Consulting Agreement" was drafted and/or reviewed and approved by Defendant Schapiro.

24. Geneva Consulting, LLC had been formed by Valitas board member David Gefner only 20 days prior to signing the multimillion-dollar consulting agreement. (Ex. 2). On information and belief, every individual associated with Geneva Consulting, LLC was also associated with Perigrove 1018, LLC.

25. On or about December 9, 2021, Defendant Lefkowitz directed Corizon's accounting department to wire $3 million to Geneva Consulting, LLC. Although the contract provided that the initial $3 million payment covered the first six months of "services," Defendants directed Corizon to begin making monthly $500,000.00 payments to Geneva Consulting LLC the very next month, starting on or about January 11, 2022.

26. Between December of 2021 and May of 2022, at the direction of Defendants, Corizon Health, Inc. made a total of six payments to Geneva Consulting, LLC totaling $5,500,000.00.

27. At the time the contract was signed, all Defendants were aware that Valitas Health Services, Inc. was insolvent, and the Defendants were contemplating a bankruptcy filing. In fact, Defendant Lefkowitz threatened to "wipe out" the claims of Valitas' recently-fired CEO via a

bankruptcy filing on December 10, 2021, only one day after the initial $3 million payment to Geneva. (Ex. 3).

28. Each transfer of funds to Geneva constituted an independent violation of 18 U.S.C. § 152(7), a racketeering activity as defined in 18 U.S.C. § 1961(1)(D).

29. Corizon Health, Inc., by then known as Tehum Care Services, Inc., eventually filed a Chapter 11 petition on February 13, 2023. Defendant Lefkowitz signed the Statement of Financial Affairs (SOFA), and two amended SOFAs, under penalty of perjury. Defendant Lefkowitz did not disclose any of the pre-petition payments to Geneva Consulting, LLC in the SOFAs, even though these payments were payments to insiders that are required to be disclosed to creditors under the Bankruptcy Code. Each SOFA and amended SOFA that Lefkowitz signed under penalty of perjury while omitting the payments to Geneva constituted an independent violation of 18 U.S.C. § 152(3), a racketeering activity as defined in 18 U.S.C. § 1961(1)(D).

30. On information and belief, Defendant Goldberger sought to extract funds from Corizon Health, Inc., while it was insolvent, through insider deals with staffing companies that he and his family members owned. Defendant Goldberger, his wife, and some of his adult children incorporated new staffing companies in January of 2022 in various jurisdictions where Corizon did business, including in Florida and in New Mexico.

31. On information and belief, the purpose of these companies was to siphon funds out of Corizon Health, Inc. prior to a bankruptcy filing, by employing nurses to work in correctional facilities through the new staffing agencies rather than having Corizon Health, Inc. employ them directly, then charging Corizon a premium above the actual labor cost which would accrue as profit to companies owned by Defendant Goldberger and his family members. The purpose of this

structure was to remove cash from Corizon Health, Inc. in advance of a bankruptcy filing, while making it appear that the payments were made in the ordinary course of business to unrelated, legitimate 3rd-party vendors.

32. On information and belief, Defendant Goldberger did, in fact, siphon funds out of Corizon Health, Inc. while it was insolvent and in contemplation of bankruptcy, through payments to staffing agencies owned by himself and/or his family members. Each such act constituted an independent violation of 18 U.S.C. § 152(7), a racketeering activity as defined in 18 U.S.C. § 1961(1)(D).

33. Soon after the acquisition, the new owners also opened two new accounts in the name of Corizon Health, Inc. and its subsidiary Corizon, LLC at Signature Bank (the "Signature Accounts").

34. While the Signature Accounts were titled in the name of Corizon, Corizon's accounting staff and executives could not access or view the activity occurring within the Signature Accounts. Only certain representatives of Defendant Perigrove 1018 LLC could view activity within the Signature Accounts. On information and belief, these persons included Defendants Lefkowitz, Gefner, Goldberger, Schapiro, and Landau.

35. Corizon's Chief Financial Officer requested view-only access to the Signature accounts on or about January 19, 2022, (Ex. 4), but he was not provided access.

36. Periodically, Defendant Lefkowitz would direct Corizon's accounting department to transfer large sums of money from Corizon's operating account at Bank of America to these Signature Accounts.

37. Though Corizon's accounting department did not have access to the Signature Accounts, Corizon's internal accounting records show that the accounting department understood the Signature Accounts to be operating accounts in Corizon's name from which funds could be accessed for Corizon's use. However, the Signature Account statements produced in Corizon's subsequent bankruptcy demonstrate otherwise.

38. In many instances, once Corizon transferred funds from its Bank of America accounts to the Signature Accounts, those funds were immediately transferred out of the Signature Accounts to separate accounts belonging to M2 LoanCo, LLC, which was an indirect subsidiary of Defendant Perigrove 1018 LLC.

39. In total, $24.5 million was siphoned out of Corizon Health, Inc. through the Signature Accounts between December of 2021 and May of 2022, with the removal of cash concealed from Corizon's internal accounting department.

40. Each transfer of funds out of the Signature Accounts constituted an independent violation of 18 U.S.C. § 152(7), a racketeering activity as defined in 18 U.S.C. § 1961(1)(D).

**"Project Orange"**

41. On or about January 17, 2022, the new owners of the Corizon family of entities retained the law firm White & Case, LLP to carry out something called "Project Orange."

42. The purpose of Project Orange was to use the Texas divisive merger statute to effectuate a corporate restructuring that would siphon out all of the productive assets of Corizon into a new entity that Corizon's new owners would also control, while abandoning most of Corizon's liabilities, including its defense and indemnification obligations to its former employees such as Chad Goetterman and Dr. Papendick, in a rump shell company.

43. On information and belief, the plan to carry out Project Orange was concocted during a meeting of some of the Defendants that took place in Florida in December of 2021. In attendance at the meeting were Defendants Tirschwell, Landau, Goldberger, Lefkowitz, and Gefner, as well as Brian Pfeiffer, a lawyer from White & Case LLP.

44. In furtherance of Project Orange, the new CEO of Corizon, Defendant Sara Tirschwell, incorporated a new Texas entity called "Yescare Corp." on January 26, 2022.

45. The next step of the restructuring was to change Corizon Health's state of incorporation from Delaware to Texas. This was done on or about April 28, 2022.

46. The third step was a merger of Corizon Health, Inc., Valitas Health Services, Inc. (Corizon Health's parent company), and two of Corizon Health's subsidiaries, Corizon, LLC and Corizon Health of New Jersey, LLC, into one Texas corporation: Corizon Health, Inc. (the "MergeCo").

47. Immediately following the combination merger, which consolidated all of the assets and liabilities of the four related entities in the MergeCo, the MergeCo underwent a Texas divisional merger, splitting itself into two entities: Corizon Health, Inc. (the "RemainCo") and CHS TX, Inc. (the "NewCo"). The divisional merger was consummated on May 5, 2022.

48. In this corporate mitosis, CHS TX., Inc. received all of Corizon Health, Inc.'s active government contracts, all of the cash in Corizon Health, Inc.'s bank accounts except for $1 million, and all of Corizon Health's employees, intellectual property, and service contracts relevant to its ongoing business.

49. On the day of the divisional merger, the cash in the MergeCo bank accounts that were allocated to CHS TX, Inc. totaled approximately $19,928,935.98.

50. The RemainCo, Corizon Health, Inc., was left with no employees, no operations, over $100 million in trade debt to vendors such as hospital systems, and massive contingent liabilities for nearly five hundred individual personal injury lawsuits and employment law claims.

51. While the RemainCo was allocated some insurance rights under the Lone Star policies that ostensibly provide coverage for former Corizon employees like Chad Goetterman and Dr. Papendick, the RemainCo was not allocated sufficient cash or assets to satisfy the approximately $20-million-per-policy-year self-insured retentions applicable under those policies.

52. The only significant assets that the Corizon Health, Inc. was allocated in the divisional merger were $1 million in cash and a contractual right to receive $15 million from M2 LoanCo, LLC.

53. The $15 million made available to Corizon Health, Inc. under a "funding agreement" with M2 LoanCo was less than the $24.5 million that had been secreted from Corizon to M2 LoanCo through the Signature Accounts in the months leading up to the divisional merger. It was also less than the $19.9 million in Corizon's operating accounts that were transferred to CHS TX, Inc. on the date of the divisional merger.

54. On or about May 17, 2022, less than two weeks after the divisional merger, the $1 million left with Corizon was also transferred to M2 LoanCo by Defendant Lefkowitz. This act constituted yet another independent violation of 18 U.S.C. § 152(7), a racketeering activity as defined in 18 U.S.C. § 1961(1)(D).

55. A series of additional contracts and transactions, also executed between various entities under common control, were also consummated on May 5, 2022, at the same time as the divisional merger transaction.

56. Immediately prior to the divisional merger, MergeCo was wholly-owned by Valitas Intermediate Holdings, Inc. ("VIH"). Immediately after the divisional merger was consummated on May 5, VIH sold 100% of the equity of NewCo to Yescare Corp. for $100.

57. When VIH sold 100% of the equity of the NewCo to Yescare Corp., Sara Tirschwell simultaneously sold 95% of the equity of Yescare Corp. to Yescare Holdings, LLC for $95.

58. Yescare Holdings, LLC was another new entity organized by Defendant Gefner.

59. Also on May 5, 2022, at the same time it acquired the NewCo, Yescare Corp. and the NewCo entered into a "Management Services Agreement" with Geneva Consulting LLC. Yescare Corp. and the NewCo also entered into at least two ancillary agreements with Geneva on May 5: a "Stock Restriction Agreement," and a "Security Agreement." On information and belief, these agreements were drafted and/or reviewed and approved by Defendant Schapiro.

60. Together, these three agreements between Geneva Consulting, LLC, Yescare Corp. and the NewCo enable Geneva Consulting to dominate and control Yescare Corp. and the NewCo as if it were the sole owner of those entities. Provisions in these agreements include:

a) the Yescare Entities (NewCo and Yescare Corp.) may not enter into any contract committing them to incur expenses greater than One Thousand Dollars ($1000) on an annual basis, without obtaining approval in writing from Geneva Consulting;

b) the Yescare Entities may not purchase any asset(s) for a price exceeding Two Thousand Five Hundred Dollars ($2500) without obtaining approval in writing from Geneva Consulting;

c) the Yescare Entities may not hire, fire, or lay off any employee without advance written permission from Geneva Consulting;

d) the Yescare Entities may not pay dividends or distributions to their owners without approval in writing from Geneva Consulting;

e) the owners of the Yescare Entities may not sell or transfer their ownership interests in the Yescare Entities without Geneva's permission;

f) the Yescare Entities must grant Geneva Consulting control over their bank accounts, including the ability to withdraw funds;

g) the Yescare Entities granted Geneva Consulting a lien on all of their assets, to secure their performance under the Management Services Agreement;

h) the Yescare Entities must pay Geneva "all cumulative direct or indirect expenses incurred by [Geneva], (including, without limitation, an allocable percentage of Manager's corporate overhead) in providing the Management Services" in addition to paying Geneva's "Management Fee;"

i) Geneva's Management Fee, which is set at a minimum of $500,000 per month, "will be subject to revision by [Geneva]" without the need to obtain the Yescare Entities' consent for any future increase;

j) the initial term of the Management Services Agreement is 30 years, with automatic renewals for successive five-year terms thereafter. During the initial term, the MSA can be terminated prior to its expiration by Geneva without cause, but cannot be terminated without cause by the Yescare Entities.

61. The practical economic effect of the series of related insider transactions entered into on May 5, 2022 was to grant Geneva Consulting, LLC effective possession and control over the productive assets of the Corizon family of companies, while leaving behind all of the operational liabilities of the enterprise in the RemainCo, a non-operating shell company. These abandoned liabilities included defense and indemnity obligations owed to Corizon's former employees.

62. Defendants caused Geneva Consulting, LLC to become a wholly-owned subsidiary of Genesis Healthcare, Inc., a nursing home business under the control of Defendant Landau.

63. On June 1, 2022, Defendant Lefkowitz changed the name of the RemainCo from "Corizon Health, Inc." to "Tehum Care Services, Inc."

64. On February 13, 2023, Tehum Care Services filed a Chapter 11 bankruptcy petition. On the filing date, Tehum had no operating business, no employees, no cash, no fixed assets, no funding available under the funding agreement, and over $100 million in liabilities. Tehum's many creditors included hospital systems and other unpaid vendors, inmate tort claimants, and former employees owed duties of defense and indemnification, including Chad Goetterman and Dr. Papendick.

65. In anticipation of a bankruptcy filing, and in an attempt to establish a colorable argument that the divisional merger and related transactions were not a fraudulent transfer, on or about February 8, 2022, the new owners of Corizon retained FTI Capital Advisors to produce a fairness opinion, evaluating the fairness of the proposed transaction, from a financial perspective, to Corizon's unsecured creditors.

66. On information and belief, the new owners of the Corizon entities paid FTI Capital Advisors $300,000 to prepare the fairness opinion.

67. Corizon's accounting department kept track of the transfers to the aforementioned Signature Accounts and, believing the funds remained there and readily available for the company, included those amounts as assets in providing information to FTI for the Fairness Opinion. But FTI could not conduct its analysis of the Corizon books and records without some level of verification that the financials were in order and devoid of obvious fraud. This meant that any summary of company assets held in bank accounts required actual bank statements in order to be verified—a tall order because no one in Corizon's accounting department (or anywhere else at the company) had access to the Signature Accounts or accompanying statements.

68. Mr. Lefkowitz and the other Defendants had a problem – FTI needed to confirm the amounts in the Signature Accounts, but providing the actual account statements would reveal their fraud to FTI and the Corizon accounting department. As of February 28, 2022, rather than the $22.3 million the company's accounting department believed remained in one of the Signature accounts, the account contained a paltry $12,583. Mr. Lefkowitz stalled, but by late April, as the deadline for the Fairness Opinion and the planned Divisional Merger date approached, he had to provide evidence of the funds.

69. Mr. Lefkowitz solved the problem by falsifying a bank statement for one of the Signature Bank Accounts. On April 28, 2022, he provided Corizon employees and FTI with a statement purportedly showing that Corizon had $22,306,821.78 in that Corizon Signature Account as of February 28, 2022.

70. On May 1, 2022, FTI issued an opinion concluding that the divisional merger transaction was fair to Corizon's unsecured creditors.

71. In arriving at its opinion, FTI relied on, and assumed the accuracy of, various unaudited financial statements and representations proffered to it by Corizon's management, including the forged bank statement proffered by Defendant Lefkowitz.

72. When Defendant Lefkowitz forged the bank statement and presented it to FTI in order to secure the Fairness Opinion in contemplation of bankruptcy, he violated 18 U.S.C. § 152(8), which is a racketeering activity as defined in 18 U.S.C. § 1961(1)(D).

**Defendants Repeatedly Mislead Chad Goetterman's and Dr. Papendick's Defense Attorneys About the Consequences of the Divisional Merger**

73. Throughout his years of service to Corizon Health, Inc., Dr. Keith Papendick, M.D. practiced medicine within Michigan's prison system.

74. The patient population within Michigan's prison system is exceptionally litigious when compared with non-incarcerated patients. Dr. Keith Papendick, like many health care professionals who work in correctional facilities, has been subject to repeated lawsuits brought by his prisoner-patients, typically alleging that the medical care he provided constituted "cruel and unusual punishment" under the Eighth Amendment to the United States Constitution.

75. Dr. Papendick has been sued by prisoners twenty-nine times since January of 2019, even though he stopped working for Corizon Health in September of 2021. Over the course of his tenure, Dr. Papendick was sued by prisoners more than fifty times; more often than any other employee of Quality Correctional Care of Michigan, P.C.

76. The reason for the extremely high number of lawsuits filed against Dr. Papendick, personally, was not that Dr. Papendick was a particularly negligent medical doctor. Rather, Dr. Papendick was sued with extreme frequency due to the nature of his role at the company.

77. Unlike nearly every other employee of Quality, Dr. Papendick did not work in a prison for the majority of his tenure, providing medical care to prisoners face-to-face. Dr. Papendick only provided in-person medical care to prisoners for the first 18 months of his employment. During that time period, Dr. Papendick was not sued even once.

78. However, in 2014, Dr. Papendick was promoted to the position of Utilization Management Medical Director. In that role, his job was to screen requests from the primary-care physicians, who actually examine and treat prisoners, to send their patients to outside specialists. If an employee of Quality Correctional Care of Michigan, P.C. wanted to refer a prisoner to an outside specialist, they needed to request permission for the referral from a Corizon Utilization Management Medical Director ("UMMD"). Dr. Papendick was the primary UMMD in charge of screening requests for the Michigan prison system.

79. Under its contract with the Michigan Department of Corrections, Corizon was responsible for a portion of the cost of any outpatient specialty medical care it provided for Michigan prisoners. This structure gave Corizon a financial incentive to limit the amount of specialty care provided to Michigan prisoners, because Corizon's profits decreased every time a prisoner was sent to an outside specialist.

80. Thus, whenever a Michigan prisoner was denied access to medical treatment that could improve their quality of life, such as surgery to remove cataracts, a referral to an audiologist for a hearing aid, or an orthopedic surgery like a knee replacement, the person responsible for

issuing the denial was Dr. Papendick. If the prisoner filed a lawsuit challenging the denial of care, the prisoner frequently sued Dr. Papendick.

81. For the most part, Dr. Papendick's denials of care were not mistakes. The purpose of Dr. Papendick's job was to limit access to medical treatment for Michigan prisoners in order to save money for Corizon. Dr. Papendick was instructed not to approve any treatment unless the treatment was necessary to preserve life or limb, or necessary to enable the prisoner to complete activities necessary for daily living, such as eating, toileting, walking, or getting in or out of bed. Although Dr. Papendick was frequently sued by prisoners for denying them healthcare, he was merely carrying out his job duties as he had been instructed by his employer.

82. In order to induce Dr. Papendick and other health care professionals to accept and continue in employment in roles in which they would be sued frequently, Corizon Health, Inc. expressly promised to defend and indemnify all of its employees and former employees for any employment-related lawsuits filed against them by their prisoner-patients, and to continue to provide such defense and indemnity even if an employee quit their job or was fired.

83. From the time of its formation in 2011 through mid-2022, Corizon Health, Inc. did, in fact, defend and indemnify all of its employees and former employees with respect to any and all claims filed against them arising out of their employment with the company. Corizon Health, Inc. even defended and indemnified its current and former employees when they were sued for on-the-job intentional torts, such as battery and sexual assault.

84. In addition to promising to defend and indemnify its employees with respect to any lawsuits that prisoners filed against them, and actually tendering defense and indemnification to its employees and former employees whenever they were sued by prisoners, Corizon Health, Inc.

also represented to its employees that they were insureds under medical-malpractice liability insurance policies. Corizon Health, Inc. provided its employees with certificates of liability insurance naming the employee as a "covered person," supposedly protected by an insurance policy with a $1 million per-claim policy limit.

85. Chad Goetterman was one such former employee. Mr. Goetterman worked as a nurse, caring for prisoners in the Kent County Jail while Corizon was the healthcare contractor for that facility in April of 2018. On April 27, 2018, while Goetterman was on duty, a prisoner went into cardiac arrest due to complications from alcohol withdrawal. That prisoner died, and Goetterman was among the nine medical professionals who were sued by the deceased prisoner's estate.

86. Although Corizon Health, Inc. proffered certificates of liability insurance to its employees and former employees upon request, it typically refused to produce the full insurance contract. Corizon's reticence to produce insurance contracts extended not only to its employees, but also to opposing counsel in prisoner lawsuits pursuant to its obligations under Fed. R. Civ. P. 26(a)(1)(A)(iv). *See Jones v. Kent Cnty.*, 2020 U.S. Dist. LEXIS 265575 (W.D. Mich. 2020).

87. A copy of the insurance contract for Lone Star Alliance Policy No. 4-453668 became available as a result of a motion to compel filed by plaintiff's counsel in the lawsuit filed against Mr. Goetterman, *Jones v. Kent County*, et al., 20-cv-00036 (W.D. Mich.). (Ex. 5).

88. The insurance contract that Corizon Health reluctantly disclosed in the Jones case demonstrates that the malpractice liability insurance that the company procured for its medical providers, including for Dr. Papendick, was essentially illusory. Per the policy, "the maximum total amount payable" by the insurer for damages as a result of injuries occurring during the one-

year policy period was $4 million. But the insurer's obligation to pay damages sat behind a massive self-insured retention of $20 million.

89. This $20 million self-insured retention "is reduced by damages only, not Defense Costs. Defense Cost are paid directly by the First Named Insured and do not erode the Limits of Insurance or the Self-Insured Retention." (Ex. 5, pg. 1).

90. The 4-453668 Lone Star insurance policy also provides:

> "Under no circumstances will we make any payment under this policy unless and until the First Named Insured has exhausted the Aggregate Self-Insured Retention by the payment of damages arising from covered medical incidents. If the First Named Insured is unable to pay any part of the Self-Insured Retention due to bankruptcy, insolvency, or other financial difficulty, then this policy will not be required to 'drop down' to make payments of policy limits and/or defense costs, and no payment of any kind will be available to the First Named Insured or any Insured under this policy."
>
> (Ex. 5, pg. 32).

91. Thus, per the terms of the policy, the insurer is never liable for defense costs, and is not responsible for any indemnification of any covered person until and unless Corizon Health has paid $20 million in damages and settlements for medical malpractice claims arising during the one-year policy period.

92. On information and belief, to date, only $5,800,550 of the $18 million self-insured retention for the 2016 Lone Star policy (Policy No. 4-100092) has been satisfied. The outstanding SIR for the 2018 Lone Star policy is also in excess of $10 million.

93. On information and belief, Defendants King, Tirschwell, Lefkowitz, Gefner, Goldberger, Landau, Leitner, Schapiro, and Perigrove 1018 LLC did not inform the former employees of Quality Correctional Care of Michigan, P.C. or Corizon Health, Inc, including Dr. Papendick and Chad Goetterman, that they had removed all of the cash from Corizon that was

potentially available to pay the self-insured retentions under the Lone Star policies that purportedly provided these former employees with professional-liability coverage.

94. On information and belief, Defendants King, Tirschwell, Lefkowitz, Gefner, Goldberger, Landau, Leitner, Schapiro, and Perigrove 1018 LLC did not inform the former employees of Quality Correctional Care of Michigan, P.C. or Corizon Health, Inc., including Dr. Papendick and Chad Goetterman, of the divisional merger.

95. In the summer of 2022, Dr. Papendick was a named defendant in numerous pending lawsuits concerning medical decisions he made for Michigan prisoners in the course of his employment, including a lawsuit brought by Plaintiff Andrew Lyles and a lawsuit brought by Plaintiff Kohchise Jackson. At the time, Dr. Papendick was represented in that litigation by attorney Ronald Chapman, Sr., a shareholder at Chapman Law Group. Chad Goetterman was a named defendant in *Jones v. County of Kent, et al.*, 20-cv-00036 (W.D. Mich.), and was also represented by Ronald Chapman, Sr. of Chapman Law Group.

96. On June 27, 2022, Defendant Lefkowitz spoke with Ronald Chapman, Sr. over the phone. During the conversation, he promised that he and Yescare would indemnify and cover defense costs for all former employees of Quality Correctional Care of Michigan, P.C. and Corizon Health, Inc., including Dr. Papendick and Chad Goetterman, in all professional liability suits relating to their on-the-job conduct.

97. At the time that Defendant Lefkowitz promised Dr. Papendick's attorney that he and Yescare would indemnify Dr. Papendick and Chad Goetterman and cover their defense costs for all of job-related lawsuits pending against them, Defendant Lefkowitz had no intention to keep that promise and made the promise in bad faith. In fact, in the divisional merger, all of Corizon's

defense and indemnity obligations to Dr. Papendick and Chad Goetterman had recently been assigned to a hopelessly-undercapitalized shell company with no cash, no employees, no operations, hundreds of tort claims pending against it, and over $100 million in trade debt owed to unpaid vendors.

98. Defendant Lefkowitz made the bad-faith promise to Dr. Papendick's and Mr. Goetterman's attorney that all former Quality and Corizon employees would be indemnified because he wanted Dr. Papendick's and Mr. Goetterman's attorney to continue defending dozens of lawsuits against Dr. Papendick, Mr. Goetterman, and the other former employees of Quality Correctional Care of Michigan, P.C. and Corizon without being paid, and not to inform the former employees that Yescare would abandon them. At the time, Defendants were attempting to win new contracts to provide correctional healthcare services for other states and local governments, in particular, a large prison healthcare contract with the State of Alabama. Defendants knew that if word got out that they were abandoning their defense and indemnity obligations to their former prison healthcare workers in Michigan, Yescare's ability to win new contracts with other state governments, including the Alabama contract, would be compromised.

99. On information and belief, Defendant Lefkowitz made the aforementioned deceptive statements to Dr. Papendick's and Mr. Goetterman's attorney on June 27, 2022 by means of interstate wire communications.

100. On information and belief, on or about July 27, 2022, Defendant Sara Tirschwell spoke with Dr. Papendick's and Mr. Goetterman's attorney, Ronald Chapman, Sr., over the phone. Defendant Tirschwell told Dr. Papendick's and Mr. Goetterman's attorney that Corizon had sufficient resources to cover all of its defense and indemnification obligations to its former

employees and the former employees of Quality Correctional Care of Michigan, P.C. Defendant Tirschwell further represented that neither Corizon nor Yescare would file for bankruptcy protection.

101. Defendant Tirschwell knew, on July 27, 2022, that Corizon did not have sufficient resources to cover its defense and indemnification obligations to its former employees or former employees of Quality Correctional Care of Michigan, P.C., including Dr. Papendick and Mr. Goetterman. Less than three months before she made these statements to Dr. Papendick's and Mr. Goetterman's attorney, Defendant Tirschwell had orchestrated the divisional merger transaction for the express purpose of abandoning Corizon's unsecured liabilities, including its defense and indemnity obligations, in a deeply-insolvent shell company, while transferring the active business to a Yescare Corp. subsidiary.

102. On information and belief, on July 27, 2022, Defendant Tirschwell also knew that Corizon would file for bankruptcy protection. On or about May 1, 2022, in anticipation of a Corizon bankruptcy filing, Defendants Tirschwell, King, Lefkowitz, Goldberger, and Gefner caused Corizon to enter into an "indemnification" agreement with "NewCo and its affiliates (other than RemainCo and its subsidiaries) and its and their respective officers, directors, shareholders, members, partners, members, employees, successors and permitted assigns," whereby the deeply-insolvent RemainCo (Corizon) agreed to defend and indemnify Yescare, its affiliates, and its principals from any claims pertaining to the liabilities that were assigned to the RemainCo in the divisional merger. The liabilities assigned to the RemainCo included the responsibility to defend and indemnify Dr. Papendick and Mr. Goetterman from personal-injury lawsuits.

103. These Defendants knew that as a practical matter, the RemainCo (Corizon) lacked the resources to defend and indemnify the NewCo (Yescare) and its insiders after the divisional merger. The purpose of the sham indemnification agreement was to allow the RemainCo to argue in bankruptcy court that the automatic stay of litigation against a debtor in bankruptcy imposed per 11 U.S.C. § 362 should be extended to litigation against the non-bankrupt NewCo and its insiders, including all of the Defendants.

104. Defendant Tirschwell made the aforementioned deceptive statements to Dr. Papendick's and Mr. Goetterman's attorney on July 27, 2022 by means of interstate wire communications.

105. On information and belief, on August 17th and/or August 18th, 2022, Dr. Papendick's and Mr. Goetterman's attorneys informed Defendant King that they had determined that simultaneously representing Corizon and the former employees of Corizon and Quality Correctional Care of Michigan, P.C. presented a potential conflict of interest, given the likelihood that Defendants, who also controlled Corizon, would seek to evade their obligations to defend and indemnify former employees for job-related personal injury lawsuits. Dr. Papendick's and Mr. Goetterman's attorneys informed Defendant King that they intended to withdraw from the representation.

106. On or about August 18, 2022, Defendant King, who at that time was the Chief Legal Officer for Yescare, emailed Dr. Papendick's and Mr. Goetterman's attorneys, stating that, "I would like to schedule a call for us to talk and make sure we fully understand your position with respect to the individual defendants. Also, while I respect your decision to withdraw, there may be ways to provide you with sufficient assurances on Corizon being capable of continuing to pay for

defense and indemnity costs associated with these cases." Defendant King sent the email by means of interstate wire communication.

107. Defendant King, Defendant Lefkowitz, and Dr. Papendick's and Mr. Goetterman's attorneys then convened a Zoom meeting on August 19, 2022 at 2:30pm. During the meeting, Defendants Lefkowitz and King promised that Dr. Papendick, Mr. Goetterman, and all the other former employees of Quality Correctional Care of Michigan, P.C. and/or Corizon Health, Inc. who were represented in personal injury litigation by Chapman Law Group, would be indemnified and have their defense costs covered by Yescare Corp., and Defendant Lefkowitz, personally.

108. Defendant Lefkowitz promised during the meeting that he would personally guarantee payment of all indemnity payments and attorney fees and expenses associated with personal injury lawsuits brought against former Quality employees.

109. Defendants King and Lefkowitz made the aforementioned promises to Dr. Papendick's and Mr. Goetterman's attorneys in bad faith, without the intent to keep them.

110. During the meeting, Defendants King and Lefkowitz urged Dr. Papendick's and Mr. Goetterman's attorneys to stay on as counsel, and not to notify their medical-professional clients of the financial instability of Yescare/Corizon. Defendants King and Lefkowitz expressed deep concern that if Dr. Papendick's and Mr. Goetterman's attorneys withdrew, various state and local governments would cancel contracts with Yescare and would decline to award new business to Yescare.

111. On information and belief, in accordance with Defendant Lefkowitz and Defendant King's requests, Dr. Papendick's and Mr. Goetterman's attorneys did not inform them of the potential financial instability of Yescare/Corizon.

112. On information and belief, Defendants King and Lefkowitz were particularly concerned that if their abandonment of their defense and indemnity obligations to their former employees in Michigan became public, Yescare would not be awarded a four-and-a-half year, $1 billion contract with the Alabama Department of Corrections that was in the advance stages of negotiation.

113. During the Zoom call, Defendant Lefkowitz also promised Dr. Papendick's and Mr. Goetterman's attorneys that Corizon would not file for bankruptcy protection.

114. In fact, Defendant Lefkowitz was aware that a bankruptcy filing by the RemainCo (Corizon) had been part of the "Project Orange" plan from the start. Project Orange was designed by sophisticated bankruptcy attorneys at White & Case LLP. Defendants Lefkowitz and Tirschwell are also bankruptcy experts; both had been involved in numerous corporate bankruptcies over the course of their careers. Defendant Lefkowitz had already changed Corizon's name to "Tehum Care Services, Inc." in advance of a planned bankruptcy filing, in order to further obfuscate its connection to Yescare Corp. and minimize the public-relations damage that would occur when he did file the entity into bankruptcy.

115. As he had always intended to do, Defendant Lefkowitz filed a Chapter 11 bankruptcy petition for Tehum Care Services, Inc., f/k/a Corizon Health, Inc. on February 13, 2023, shortly after Yescare Corp. was awarded the $1.064 billion Alabama DOC contract.

116. Each of the deceptive statements and promises made to Dr. Papendick's and Mr. Goetterman's attorneys through the interstate wires by Defendants Tirschwell, King, and Lefkowitz on June 27, 2022, July 27, 2022, August 18, 2022, and August 19, 2022 constituted

wire fraud, in violation of 18 U.S.C. § 1343, a racketeering activity as defined in 18 U.S.C. § 1961(1)(D).

**Dr. Papendick and Chad Goetterman are Abandoned Without Insurance Coverage**

117. On information and belief, on or about September 30, 2022, the plaintiff in the case against Chad Goetterman made an offer to settle the estate's claims against all of the medical-professional defendants for $700,000. Defendants Lefkowitz and King refused the settlement offer, even though the attorneys defending the claim viewed the case as unwinnable and urged Corizon's management to settle. Lefkowitz and King knew that any judgment would fall on Goetterman personally, and they would be able to file now-assetless Corizon into bankruptcy and use its bankruptcy proceedings as a litigation shield against Goetterman and the other former employees they had promised to indemnify.

118. The case was tried to verdict in November of 2022, and resulted in a $6.4 million judgment against Chad Goetterman. In August of 2023, Goetterman was also adjudicated liable for an additional $515,200 in prevailing-party attorney fees under 42 U.S.C. § 1988. Defendants did not indemnify Mr. Goetterman.

119. After they placed the "RemainCo" into bankruptcy in February of 2023, Defendants ceased making any payments to Dr. Papendick's and Mr. Goetterman's attorneys at Chapman Law Group for the defense costs incurred in representing Dr. Papendick and Mr. Goetterman. Chapman Law Group filed motions to withdraw in the cases in which they represented Dr. Papendick and Mr. Goetterman, due to the fact that the apparent failure to cover Dr. Papendick's and Mr. Goetterman's defense costs rendered Dr. Papendick's and Mr. Goetterman's interests adverse to

those of Chapman Law Group's corporate client. Those motions to withdraw were eventually granted.

120. In February of 2023, Dr. Papendick was a named defendant in approximately twelve pending personal-injury lawsuits stemming from his work in the Michigan prison system. Having been stripped of the professional liability insurance he had been promised, Dr. Papendick was forced to retain new counsel to defend himself in those lawsuits, at considerable personal expense.

121. On information and belief, Dr. Papendick and Mr. Goetterman did not actually become aware of the divisional merger or the fact that Defendants were abandoning their obligations to defend and indemnify former employees until February or March of 2023, after Corizon Health, Inc. had filed for bankruptcy protection and obtained a stay-extension order in bankruptcy court preventing Dr. Papendick, Mr. Goetterman, or anyone else from suing any of the Defendants in this case for any pre-petition conduct.

122. On information and belief, Dr. Papendick personally incurred defense costs in excess of $100,000.

123. Dr. Papendick's new attorney, Thomas Hackney, reached out to Defendants King and Yescare Corp. on numerous occasions between June 30, 2023 and September 25, 2025 and demanded that Yescare Corp. cover Dr. Papendick's defense costs and indemnify him.

124. On information and belief, various representatives acting on behalf of Yescare Corp., including Yescare General Counsel Jennifer Finger and Professional Liability Litigation Manager James M. Rachal, promised Mr. Hackney that Yescare Corp. would indemnify Dr. Papendick and cover his defense costs. These Yescare agents repeatedly asked Mr. Hackney to

submit his billable hours for his work defending Dr. Papendick to Yescare for reimbursement. However, after receiving the bills, Yescare staff avoided communication with Mr. Hackney or made various excuses for not paying Dr. Papendick's defense costs.

125. On one occasion, one Yescare employee caused a single invoice from Mr. Hackney to be paid, representing a very small portion of the defense costs for Dr. Papendick's various lawsuits. That employee's tenure at Yescare ended shortly thereafter.

126. On or about April 2, 2026, a federal jury in the Eastern District of Michigan found Dr. Papendick liable for $7,500,000.00 in compensatory damages and $100,000.00 in punitive damages for denying a prisoner, Kohchise Jackson, a consultation with a general surgeon for colostomy reversal. Mr. Jackson was forced to live with a colostomy for the remainder of his prison term, approximately two years.

127. Dr. Papendick's next trial, in Lyles v. Papendick, Case No. 19-cv-10673 (E.D. Mich.) was set to start in less than two weeks, on April 14, 2026. In Lyles, Dr. Papendick was alleged to have denied three separate requests, over the course of approximately two months, for a colonoscopy for a prisoner who was suffering severe abdominal pain and defecating blood. That prisoner, Andrew Lyles, was eventually diagnosed with ulcerative colitis after a seven-month delay. Mr. Lyles lost nearly 40% of his bodyweight, spent months in the hospital, and needed to have his entire large intestine removed. As a result, Mr. Lyles also lived with an ileostomy bag for several years.

128. To avoid the expense and uncertainty of another jury trial, and to limit the risk of an even larger judgment than the $7.6 million judgment entered against him in the Jackson case, Dr. Papendick negotiated a settlement to resolve Mr. Lyles' claim for $585,000 via a consent

judgment. Dr. Papendick also agreed to assign to Mr. Lyles his claims against the Defendants in this case, relating to the failure to defend and indemnify him in the Lyles lawsuit, and similarly assigned to Kohchise Jackson his claims against Defendants relating to the failure to indemnify him in the Jackson lawsuit.

129. The repeated promises to cover his defense costs and indemnify him between 2022 and 2025 caused Dr. Papendick to refrain from suing the Defendants to enforce his rights to defense and indemnification, particularly prior to the finalization of the Alabama DOC contract, when he would have had greater negotiating leverage.

130. The repeated promises to cover defense costs and indemnify Chad Goetterman caused Mr. Goetterman to refrain from suing the Defendants to enforce his rights to defense and indemnification, particularly prior to the finalization of the Alabama DOC contract, when Mr. Goetterman would have had greater negotiating leverage.

131. Creditors that were informed about the effects of the divisional merger prior to the bankruptcy filing were able to resolve their claims. For example, Endevis LLC, a Toledo, Ohio-based company that provided medical-professional recruiting and placement services for Corizon Health, Inc., was informed in July of 2022 that Corizon's assets had been transferred to Yescare Corp., and that Corizon lacked the funds to pay Endevis LLC approximately $170,000 in outstanding invoices. Endevis promptly sued Yescare Corp. on July 25, 2022. Yescare Corp. settled the suit almost immediately, on or about August 11, 2022.

132. Had Defendants not made the false representations to Ronald Chapman, they would have been forced to swiftly settle the claims pending against the former Corizon employees represented by Chapman, in order to prevent Chapman from filing motions to withdraw as counsel

and thus preserve their ability to win the $1.06-billion Alabama Department of Corrections contract.

133. As a result of Defendants' pattern of racketeering activity, Dr. Papendick has suffered financial losses. These losses include over $100,000 in defense costs that he now owes to his attorneys, $585,000 in damages that he owes to Mr. Lyles, for which no insurer is providing coverage, $7,500,000 in damages owed to Mr. Jackson, for which he is jointly and severally liable with CHS TX, Inc. and for which no insurer is providing coverage, and $100,000 in punitive damages owed to Mr. Jackson, for which he is individually liable and for which no insurer is providing coverage.

134. As a result of Defendants' pattern of racketeering activity, Mr. Goetterman has also suffered financial losses. These losses include personal liability for a $6,400,000.00 judgment, for which no insurer is providing coverage, and personal liability for $515,200.00 in prevailing-party attorneys' fees, for which no insurer is providing coverage.

135. Defendants are continuing to run the Enterprise and their racketeering activity is ongoing and likely to continue causing financial harm.

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, in whatever amount they are found to be entitled, including treble damages, punitive damages, plus costs, interest, and attorney's fees.

## JURY DEMAND

Plaintiffs, by and through their counsel, demand a jury trial in this case.

Dated: October 15, 2026
Queens, NY

Respectfully submitted,

**COHEN&GREEN PLLC**

Regina Yu

By: Elena L. Cohen
J. Remy Green
Regina J. Yu
1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
t : (929) 888-9480
regina@femmelaw.com

**CROSS LAW PLLC**

/s/

Ian T. Cross (*pro hac vice forthcoming)*
402 W Liberty St.
Ann Arbor, MI 48103
(734) 994-9590
ian@lawinannarbor.com

**MARKO LAW, PLLC**

/s/

JONATHAN R. MARKO (*pro hac vice forthcoming)*
Allie J. Farris (*pro hac vice forthcoming)*
220 W. Congress, Fourth Floor
Detroit, MI 48226
P: (313) 777-7777
F: (313) 470-2011
jon@markolaw.com